# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

**TINA M. PETERS,**
      Applicant,

     v.

**JOHN FEYEN**, in his official capacity
     as Sheriff of Larimer County, Colorado,
        Respondent,

    and

**PHILIP J. WEISER**, in his official capacity
     as Attorney General of the State of Colorado,
        Additional Respondent.

---

## APPLICATION FOR A WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

Applicant Tina M. Peters is incarcerated in the Larimer County Detention Center as Inmate No. 00138336, where she is serving a six-month sentence for three nonviolent misdemeanors. Ms. Peters is 69 years old, is monitored for recurrence of her lung cancer, and suffers from fibromyalgia. Since she has been incarcerated, her health has deteriorated. As her pastor has observed, her physical vigor and cognitive function has declined. She is pale, has lost weight, and has difficulties with memory and word-finding. App 617-618.

When Ms. Peters' misdemeanor sentence is completed, she will be transferred to the Colorado Department of Corrections to serve eight years and six months for three nonviolent felonies. All these convictions are currently on appeal in the Colorado Court of Appeals. App 108-110.

1

This case arose from Ms. Peters' performance of legal duties as the elected Clerk and Recorder of Mesa County and the "chief election official for the county," C.R.S. §1-1-110(3), the custodian of the county's voting system, C.R.S. §1-5-605.5, and, from the perspective of federal law, an "officer of election," 52 U.S.C. §20706, charged with ensuring compliance with federal requirements governing the election of federal officers. 52 U.S.C. §21081(a). The substantive controversies at the heart of her state prosecution center on Ms. Peters' legal duty to preserve digital election records and have a qualified expert oversee a purported software "upgrade" mandated by the Secretary of State that would erase election records in violation of 52 U.S.C. § 20701. Ms. Peters' performance of her federal duty to preserve these records by making forensic images of the Election Management System (EMS) server hard drive resulted in three detailed reports prepared by cybersecurity experts she submitted to the Board of County Commissioners, district attorney, and county attorney explaining the illegal features of the County's computerized election system. *See* App 253, 336, 480.

This Application for a Writ of Habeas Corpus does not concern the merits of those convictions but challenges the refusal of the Colorado Court of Appeals and the District Court of Mesa County to grant her bail pending appellate review of them. This Application asks this Court to order the release of Ms. Peters on bond pending appellate review of her case because the denial of bail pending review violates Ms. Peters' rights guaranteed by the United States Constitution, specifically her rights under the First and Fourteenth Amendments and her immunity from state prosecution for her compliance with her duty commanded by federal statute pursuant to the Supremacy Clause and the Privileges or Immunities Clause. The decisions of the Colorado Court of Appeals and the Mesa County District Court that denied her motions for bond pending appeal are contrary to, and involve an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. §2254(d)(1). In addition, the decisions were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. 28 U.S.C. §2254(d)(2). Ms. Peters comes to this Court for relief under its habeas corpus powers because she has no other recourse to vindicate those federal constitutional rights and secure her release pending her appeal of her convictions, having exhausted all avenues for relief available in the Colorado court system.

## JURISDICTION

**A.** This Court has jurisdiction over this Application under 28 U.S.C. § 2254(a), which provides that this Court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws … of the United States." It is well established that, while there is no freestanding federal constitutional right to bail pending appeal, once a state has made provision for bail pending appeal, the determination of a person's bail status may not infringe on any of the panoply of rights secured by the Constitution, and the writ of habeas corpus provides relief for a victim of such unconstitutional incarceration. *See, e.g., Armengau v. Bradley*, 2018 WL 4008371, at *2 (6th Cir. Mar. 22, 2018) ("[I]f a State makes provisions for bail pending appeal, it may not deny it arbitrarily or unreasonably."); *United States v. Lemon*, 723 F.2d 922, 938 & n.47 (D.C. Cir. 1983) ("A sentence based to any degree on activity or beliefs protected by the first amendment is constitutionally invalid. … Similar principles govern the determination of bail status."); *Brown v. Wilmot*, 572 F.2d 404, 405 (2d Cir. 1978) ("[A]ppellant could not have been arbitrarily or unreasonably denied bail consistent with his constitutional rights."); *U. S. ex rel. Walker v. Twomey*, 484 F.2d 874, 875 (7th Cir. 1973) ("[O]nce a state has made provision for bail pending appeal, the arbitrary denial of bail violates

the fourteenth amendment."); *Leary v. United States*, 431 F.2d 85, 89 (5th Cir. 1970) ("If the 'danger' [considered in determining bail] includes mere 'advocacy' of the use of illegal drugs or of other law violations, [the bail determination] offends the constitutional guaranty of freedom of speech."); *U. S. ex rel. Means v. Solem*, 440 F. Supp. 544, 549–50 (D.S.D. 1977) (A bond condition "which prohibits most participation in American Indian Movement activities, unconstitutionally infringes upon [the] First Amendment freedoms of speech and association [of a person in state custody]."); Stacy L. Davis, *et al.*, 16A Fed. Proc., L. Ed. § 41:248, *Bail pending appeal* (Nov. 2024) ("[O]nce a state makes provisions for such bail, the Eighth and Fourteenth Amendments require that it not be denied arbitrarily or unreasonably, and habeas corpus relief is available for a constitutional violation in denial of bail."); Elizabeth M. Bosek, *et al.,* 15 Cyclopedia. of Federal Proc. § 86:79, *Denial of bail as basis for habeas corpus relief* (3d ed. 2025) ("Habeas corpus is a proper means to secure admittance to bail, if the setting of bail is arbitrary or discriminatory in violation of constitutional requirements.").

Colorado's Constitution provides that bail may be granted to a defendant after conviction for a non-violent offense and pending appeal as long as "the person is unlikely to flee and does not pose a danger to the safety of any person or community…and the appeal is not frivolous or is not pursued for the purpose of delay." Colo. Const. art. II, §19 (2.5). *See also* C.R.S. §16-4-201.5(2); *People v. Lewis* 555 P.3d 576, 579 (Colo. 2024) ("Colorado's appeal bond statutes authorize appeal bonds for all courts."). Colorado specifies additional factors that must inform a court's adjudication of a request for bond pending appeal, including (1) the nature of the offense; (2) the length of the defendant's residence in the community and (3) her employment, family ties, and mental condition; (4) the defendant's criminal record and record of appearance at court proceedings; (5) any evidence of past or future witness intimidation or harassment by the

defendant; (6) other criminal charges pending against the defendant and (7) sentences imposed on the defendant that have been stayed pending appeal; (8) the likelihood the defendant will commit crimes during appeal; and (9) the defendant's likelihood of success on appeal. C.R.S. §16-4-202.

Thus, Colorado has established a detailed regime for granting bail pending appeal. This Court, accordingly, has jurisdiction to issue a writ of habeas corpus to remedy the violations of Ms. Peters' federal constitutional rights caused by the state courts' misapplication of that regime.

"[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution…." *Herrera v. Collins,* 506 U.S. 390, 400 (1991). The denial of bond pending appeal is not "collateral to the basis for [Ms. Peters'] incarceration." *Sellers v, Ward,* 138 F.3d 1333, 1336 (10th Cir. 1998). The denials of bond pending appeal by the Colorado courts are the cause of her current imprisonment.

The Great Writ of Habeas Corpus is enshrined in the U.S. Constitution, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Art. I, §9, cl. 2. What is known as the Suspension Clause, at a minimum, "protects the writ as it existed in 1789," when the Constitution was adopted. *Department of Homeland Security v. Thuraissigiam,* 591 U.S. 103, 116 (2020). "The writ simply provided a means of contesting the lawfulness of restraint and securing release." *Id.,* at 117. Although "[a] federal court may not issue the writ on the basis of a perceived error of state law," *Pulley v, Harris,* 465 U.S. 37, 41 (1984), it must do so when an petitioner is in custody in violation of his or her federal constitutional right. *Munaf v. Geren,* 553 U.S. 674, 693 (2008); *Preiser v. Rodriguez,* 411 U.S. 475, 484 (1971); *Hawk v. Olson,* 326 U.S. 271, 274 (1945); *United States ex rel. Means v. Solem,* 440 F.Supp. 544, 548-49 (D.S.D. 1977).

The rule is well-established in this Circuit that a federal habeas court may consider "whether the state court's application of state law results in a denial of due process." *Graham v. White,* 101 F.4th 1199, 1209 (10th Cir. 2024).

**B**. An applicant for a writ of habeas corpus under § 2254 must have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Colorado has defined what "exhaustion" entails. In pertinent part, C.A.R. 51.1 (a) provides that:

> a litigant is not required to petition for rehearing and certiorari following an adverse decision of the intermediate appellate court in order to be deemed to have exhausted all available state remedies respecting a claim of error. Rather, the litigant will have exhausted all state remedies when a claim has been presented to the intermediate appellate court … and relief has been denied.

Ms. Peters' motion for bond pending appeal was denied by the District Court of Mesa County on October 3, 2024. App 112. Ms. Peters then moved the Colorado Court of Appeals for bond pending appeal under C.A.R. 9(b), which the Court summarily denied on December 6, 2024. App 179. Accordingly, Ms. Peters has exhausted her state remedies, and has satisfied the exhaustion requirement of § 2254(b)(1)(A).

## BACKGROUND

**A.** On April 30, 2021, Ms. Peters' Office received directions from the Secretary of State's Office concerning the procedures to be followed in installing an upgrade to the software of the County's computerized voting system (called "Trusted Build") which commanded that only authorized staff from the State, the County, and the software vendor could be present during the installation of the upgrade. App 567. Representatives of the vendor and the Secretary of State's Office informed Ms. Peters that the upgrade would delete programs required to retain federal election data on the Mesa County EMS server. Ms. Peters was unwilling to violate federal law by participating in deleting data that she was legally required to preserve as Mesa County Clerk.

Acting on what federal law required, Ms. Peters asked the Mesa County IT Department to oversee the installation of the software upgrade, but the Department declined because it had no experience or training in the computerized voting system involved. App 569 Ms. Peters then engaged Conan Hayes, a federal cybersecurity expert with active government security clearances, to make, under her supervision, forensic images of Mesa County's EMS hard drive before and after the software upgrade performed by the Secretary of State and to oversee the installation of the software modification on the County's voting system computers on May 25, 2021. App 688-718.

Mr. Hayes utilized alternative identities in past government work.  App 579. Consistent with past government operations, Mr. Hayes asked Ms. Peters to conceal his real identity because of concerns for his personal safety.  Mr. Hayes said that he had worked on confidential government corruption operations and was instrumental in the collapse of an international organized crime organization tied to the Cartels.  Id.  Ms. Peters arranged for another computer contractor, Gerald Wood, to apply for and obtain a Mesa County keycard allowing access to secure areas. App 657-688. Mr. Hayes then used Mr. Wood's keycard with Mr. Wood's consent to enter the room containing the EMS (*Id*), which he did both the day before and the day after the software modification to make forensic images of the EMS hard drive. Those images did not disclose the votes of individual voters nor contain any other confidential information. Mr. Hayes also used the Wood keycard to observe the installation of the software modification when it occurred. Mr. Hayes merely observed; he did not disrupt or interfere in the software modification performed by the Secretary of State's staff. App 572:9-12.

The forensic images of the EMS hard drive, which were made before and after the software upgrade performed by the Secretary of State, proved that Ms. Peters appropriately

preserved digital election records as required by federal law, and that the data would have been lost forever if she had not preserved it with cybersecurity expert Conan Hayes.   The images were closely analyzed by three cybersecurity experts. Their analyses were memorialized in three detailed reports, which Ms. Peters submitted to the County Board of Commissioners, the district attorney, and the county attorney, explaining the illegal features of the County's computerized voting system.  The illegal features included internet connectivity and uncertified software.  *See* App 253, 336, 480

During the software modification, Ms. Peters took steps to memorialize the process and the data by making a video recording and photographs on her cell phone.  Representatives from the Secretary of State's Office and the vendor were aware she was filming and did not object. App 573:16-25.  No statute or regulation prohibited Ms. Peters from making the video or taking pictures with her cellphone. At the time, no Rule restricted a consultant selected by Ms. Peters from attending the installation. Indeed, as the custodian of the voting system under Colorado law, the facility in which the EMS was located, was in an institutional sense "her" facility. At that time, neither the Secretary of State and nor anyone else had the authority, other than the Clerk, to mandate how any activity, most especially activity directly affecting the EMS and the records of elections, was to be conducted, much less to impose requirements restricting access to the EMS facility.  Under Election Rule 20.5.3(b) then in effect, Ms. Peters was entitled to have Mr. Hayes or whomever she chose attend the installation so long as she personally accompanied the individual. Thus, the Secretary of State had no authority to impose any restrictions on access to the software "upgrade" installation or on Ms. Peters' discretion to bring into the EMS facility any individual she chose.

**B.** Ms. Peters was convicted in the Mesa County District Court on August 12, 2024, on three felony counts of attempting to influence a public servant by deceit with the intent to alter or affect his or her decision, vote, opinion, or action in violation of C.R.S. §18-8-306, one felony count of conspiring to commit criminal impersonation in violation of C.R.S. §§18-5-113(1)(B)(1) and 18-2-201, one misdemeanor count of official misconduct to obtain a benefit or maliciously harm another in violation of C.R.S. §18-8-404(1), another misdemeanor count of failure to perform her official duty in violation of C.R.S. §1-13-107(1), and a third misdemeanor count of failure to comply with the rules of the Secretary of State in violation of C.R.S. §1-13-114.

On October 3, 2024, the trial court sentenced Ms. Peters to a total of nine years of incarceration. A Notice of Appeal was filed on November 7, 2024. App 165.

Ms. Peters filed a Motion for Bond Pending Appeal in the trial court, which was denied in an October 3, 2024, Order: "For the reasons stated on the record during today's proceedings, and for the additional reasons stated in the response." App 112.  The trial court made it clear that the central reason driving its refusal to continue her bond pending appeal was the misguided conclusion that she was a danger to the community because of her statements about the illegal features of the computer voting system:

> [Y]ou are a charlatan and you cannot help but lie as easy as it is for you to breathe. You betrayed your oath for no one other than you. And this is what makes Ms. Peters such a danger to our community. It's the position she held that has provided her the pulpit from which she can preach these lies, the undermining of our democratic process, the undermining of the belief and confidence in our election systems.

App 99:18-24.

But the trial court did not stop there, continuing:

> So the damage that is caused and continue to be caused is just as
> bad, if not worse, than the physical violence that this court sees on
> an all too regular basis. And it's particularly damaging when those words come from
> someone who holds a position of influence like you. Every effort to undermine the
> integrity of our elections and the public's trust in our institutions has been made by you.
> You've done it from that lecturn. The voting public provided you with everything you've
> done has been to retain control influence. The damage is immeasurable. And every time it
> gets refuted, every time it's shown to be false, just another tale is weaved.

App 100:4-14.

With a final flourish, the trial court concluded:

> [P]rison is for those folks where we send people who are a
> danger to all of us, whether it be by the pen or the sword or the
> word of the mouth.

App 101:14-16.

On November 17, 2024, Ms. Peters filed a Motion for Bond Pending Appeal pursuant to

C.A.R. 9(b) and C.R.S. §16-4-201.5 in the Court of Appeals. App 251.  The Attorney General

filed a Response, App 288, to which Ms. Peters replied. App 301.  By Order dated December 6,

2024, a panel of the Court of Appeals published the following as its only statement regarding the

Motion:

> Upon consideration of the motion for bond pending appeal, and having reviewed the
> response filed in opposition and the reply thereto, the Court DENIES the motion.

App 250.

Thirteen days after Ms. Peters' motion for bond pending appeal was denied, a different

panel of the Court of Appeals vacated Ms. Peters' conviction for contempt.  App 239-247.  The

trial court relied on the now-vacated contempt conviction when it sentenced Ms. Peters to nine

years and denied her bond pending appeal. App 62:25 – 63:1; 68:10-25.

## ARGUMENT

### I. THE COLORADO COURTS DENIED MS. PETERS BOND PENDING APPEAL IN PART ON THE UNCONSTITUTIONAL GROUND THAT HER SPEECH MADE HER A DANGER TO THE COMMUNITY.

**A.** Based on the extensive analysis of three cybersecurity experts of the forensic images of the Mesa County EMS hard drive Ms. Peters secured – analyses contained in reports Ms. Peters submitted to the Board of County Commissioners, App 253, 336, 480 – Ms. Peters expressed grave concern about the illegal features of the voting system used in Mesa County. As Ms. Peters explained in transmitting the second report to the recipients:

> I had these images taken to preserve election records and help determine whether the county should continue to utilize the equipment from this vendor. Because the enclosed report reveals shocking vulnerabilities and defects in the current system, planning my office and other county clerks in legal jeopardy, I am forwarding this to the county attorney and to you so that the county may assess its legal position appropriately. Then, the public must know that its voting systems are fundamentally flawed, illegal, and inherently unreliable.

App 335.

Ms. Peters went on:

> [I]t appears that our county's voting system was illegally certified and illegally configured in such a way that "vote totals can easily be changed." We have been assured for years that external intrusions are impossible because these systems are "air gapped," contain no modems, and cannot be accessed over the internet. It turns out that these assurances were false. In fact, the Mesa County voting system alone was found to contain thirty-six (36) wireless devices, and the system was configured to allow "any computer in the world" to connect to our EMS server. For this and other reasons – for example, the experts found uncertified software that had been illegally installed on the EMS server – our system violates the federal voting System Standards that are mandated by Colorado law.

*Id.* Additionally, Ms. Peters raised these concerns in various public fora.

**B**. Ms. Peters' documented concerns about the illegal features of the Mesa County voting system was not some bizarre, off-the-wall outlier, but within the mainstream of a long-standing, legitimate public debate about the reliability of computerized voting systems. *See, e.g.,* GAO,

*Federal Efforts to Improve Security and Reliability of Electronic Voting Systems are Under Way, but Key Activities Need to Be Completed,* GAO-05-956, at 26 (Sept. 21, 2005); The National Academies of Sciences, Engineering, and Medicine, SECURING THE VOTE: PROTECTING AMERICAN DEMOCRACY, at 9 , 86-88, 91 (2018), *available at* https://nap.nationalacademies.org/catalog/25120?securing-the-vote-protecting-american-democracy; Charlotte Jee, *How to hack an election-and what states should do to prevent fake votes*, MIT TECHNOLOGY REVIEW (Sept. 13, 2018).

In 2019, U.S. Senator Amy Klobuchar (D-MN), along with several of her Democratic colleagues, observed:

> Election security experts have noted for years that our nation's election systems and infrastructure are under serious threat… researchers recently uncovered previously undisclosed vulnerabilities… these problems threaten the integrity of our elections and demonstrate the importance of election systems that are strong, durable, and not vulnerable to attack.

Letter from Sens. Amy Klobuchar (D-MN), Elizabeth Warren (D-MA), Ron Wyden (D- OR) and Rep. Mark Pocan (D-WI) to Michael McCarthy, Chairman, McCarthy Grp. (Dec. 6, 2019).

The vulnerability of electronic voting systems to hacking and manipulation has been the subject of litigation. In one of the most thorough judicial analyses of the issue, in *Curling v. Raffensperger*, U.S. District Judge Amy Totenberg received testimony from several leading cyber experts on the vulnerabilities of Dominion computer election equipment.  In her October 11, 2020, opinion, Judge Totenberg stated that

> [a] broad consensus now exists among the nation's cybersecurity experts recognizing the capacity for the unobserved injection of malware into computer systems to circumvent and access key codes and hash values to generate fraudulent codes and data.

493 F.Supp.3d 1264, 1280 (N. D. Ga. 2020).  Her opinion went on to conclude that "[t]he Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually happen?'---but 'when it will happen." *Id.,* at 1342.

Moreover, the clerk of Williamson County, Tennessee, found an anomaly in the software supplied by the same vendor used in Mesa, but in that case, the Tennessee Secretary of State and the U.S. Election Assistance Commission conducted an investigation in which the vendor disclosed that its software caused an inaccurate vote tally. App 623-627.

**C.** The district court has explained that its statements in Ms. Peters' sentencing hearing were the basis for the denial of her motion for bond pending appeal. App 112. In contrast to Ms. Peters' measured, professional expression of concerns about the integrity of the machines being used to record our elections – animated by the duties of the public office she then held – the district court in that hearing excoriated Ms. Peters for using her office – what the court called her "pulpit" – to "preach these lies, … undermining of our democratic process, … undermining the belief and confidence in our election systems." App 99:22-24. Unrestrained, the district court went on to claim that Ms. Peters' words were *worse* than the violent crimes regularly adjudicated in that court, saying, "the damage that is caused and continue to be caused is just as bad, if not worse, than the physical violence that this court sees on an all too regular basis." App 100:4-6. Unleashing its over-the-top outrage at Ms. Peters' words, the district court ventured that the "damage caused is immeasurable. And every time it gets refuted, every time it's shown to be false, just another tale is weaved." App 100:12-14. The district court would have done well to clue in Sen. Klobuchar and her colleagues, and Judge Totenberg, much less the GAO and the National Academy of Sciences, that their concerns about election integrity were based on a such a "false … tale" and had already been "refuted." Who knew?

In this context, it is no surprise that, while making such sweeping statements about weaved false tales and refuted claims, the trial court did not deign to address the analyses of the cybersecurity experts that Ms. Peters had submitted to the County Board, the DA, and the county attorney, or the federal law that Ms. Peters correctly understood governed her actions. The reason for the court's curious lapse is that, at the beginning of the case, it had ordered that the jury could not consider the federal statutory command to preserve election records and Ms. Peters' intention to comply with that command. App 629. The jury was not allowed to hear, and the record was kept scrupulously clear of, any reference to the requirements of federal law or the reasons Ms. Peters did what she did, much less the results of the expert analyses of the forensic images of the County's EMS hard drive. App 578:1-6; 572:21 – 573:1. As we will discuss below, this move by the trial court was an arbitrary and a crude violation of due process. But it conveniently left the trial court free, with no factual counterbalance, to portray Ms. Peters as a "charlatan," whose speech and actions were in some way a self-serving exercise unhinged from reality. With the case so tendentiously framed, the trial court obviously felt no compunction to cross the boundaries set by the First Amendment to claim Ms. Peters' speech alone – neither violent nor calling for violence – threatened such "damage" that she needed to be kept under lock and key while pursuing review of her case.

**D.** Ms. Peters is entitled to the protection of the Free Speech Clause of the First Amendment to the U.S. Constitution, which applies to the States by the Due Process Clause of the Fourteenth Amendment. *Nat. Inst. Of Family & Life Assoc. v. Becerra,* 585 U.S. 755, 766 (2018); *Gitlow v. New York,* 268 U.S. 652, 666 (1928). Her public statements regarding a matter of public concern about the integrity of computerized voting systems constitutes core political speech that is given the highest protection accorded by the Free Speech Clause. *See Meyer v.*

*Grant,* 486 U.S. 414, 424 (1988); *Mills v. Alabama,* 384 U.S. 214, 218 (1966); *United States v. Hernandez-Calvillo,* 39 F.4th 1297, 1308-09 (10th Cir. 2022).

It is clearly established that State officials may not prohibit or punish speech unless it is likely to produce violence or lawless action. *Counterman v. Colorado,* 600 U.S. 66, 72-74, 81 (2023); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 909-11 (1982); *Brandenberg v. Ohio,* 305 U.S. 444, 447 (1969) (*per curiam*). Likewise, a court may not deny bond pending appeal based on speech that does not incite imminent lawless conduct. *Leary v. United States,* 431 F.2d 85, 89-90 (5th Cir. 1970).

The statements made by the trial court during sentencing and consideration of Ms. Peters' motion for bond pending appeal which purported to justify its refusal to release her on bond pending her appeal was based on her protected speech and so was an unmistakable violation of her right to free speech. No statement made by Ms. Peters can be considered a true threat, intimidation, or, most certainly, a danger to the community.

*Counterman* explained the distinction between speech that is intended to incite lawlessness and violence and speech that expresses concern about a matter of public concern. 600 U.S. at 81. *See generally* C. Calvert, *Counterman v. Colorado: Defining True Threats of Violence under the First Amendment,* 2023 CATO SUP. CT. REV. 113. Speech is constitutionally protected if there is no intent by the speaker to incite lawlessness or violence. The "strong intent requirement was adopted to prevent a chilling effect on "dissenting political speech at the First Amendment's core." *Id.* Only speech that is intended as a "true threat" loses Free Speech protection. *Id.,* at 82; *cf. Elonis v. United States,* 575 U.S. 723, 740 (2015) (describing what is a "threat').

15

Government may not prohibit or punish speech because of the "mere tendency of speech to encourage unlawful acts." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002). "The government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time.'" *Hess v. Indiana,* 414 U.S. 105, 108 (1973); *see also Brandenberg*, 305 U.S. at 447. "[A] function of free speech under our system of government is to invite dispute. It may indeed serve its highest purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago,* 337 U.S. 1, 4 (1949).

In *Virginia v. Black,* 538 U.S. 343 (2003), the cross-burning case, the Court illustrated the distinction that must be drawn between expressive conduct that is protected under the Free Speech Clause and expressive conduct that is intended to intimidate a particular person or group of persons with threats of violence. The Court upheld the vacation by the Virginia Supreme Court of the conviction of one of the defendants, Barry Black, who burned a cross, because a prima facie evidence provision in the applicable criminal statute allowed the prosecution to convict solely on the fact of cross burning itself without evidence of Black's intent to intimidate a particular victim or group of victims. *Id.,* at 365-66. On the other hand, the Court set aside the Virginia Supreme Court's vacation of the convictions of the other two defendants, Richard Elliott and Jonathan O'Mara, who had been tried separately from Black, because the jury had been instructed that it must find that those defendants intended to intimidate a next-door neighbor of Elliott by burning the cross. *Id.,* at 366-67.

There is no evidence that Ms. Peters ever intended to intimidate anyone.  She acted in her official capacity to provide as much transparency as possible to her constituents.  The statements of Ms. Peters to the Board and other audiences were not "true threats" and, therefore, were

protected by the Free Speech Clause. Any reliance on Ms. Peters' protected speech as grounds for denial of her Motion would violate the Free Speech Clause of the First Amendment to the U.S. Constitution. *United States v. Lemon,* 723 F.2d 922, 937-38 (D.C. Cir. 1983) (citing similar decisions in other circuits); *Leary,* 431 F.2d. at 89-90.

**E.** The Court of Appeals simply denied Ms. Peters' Motion for Bond Pending Appeal with no explanation other than to advert to the fact that it had considered the briefs of the parties. App 179. Since the briefs of the parties set out their arguments concerning the district court's decision to keep Ms. Peters incarcerated during her appeal, by issuing such a terse decision, the Court of Appeals can only be understood as adopting the erroneous reasoning of the district court.

The decision of each of the Colorado courts in failing to apply, or in unreasonably applying, the clearly established rule that speech on a matter of grave public concern is protected by the Free Speech Clause and cannot be used by the State to punish unless the speaker intends to intimidate or threaten a particular individual or group of individuals justifies the grant of this application pursuant to 28 U.S.C. §2254(d)(1). Further, each decision was based on an unreasonable determination to the extent that it was material under the applicable Colorado statutes that Ms. Peters is a charlatan, lied as easily as she breathed, betrayed her oath making her a danger to the community, which conclusions are contrary to the evidence presented to those courts that demonstrated her statements about the illegal features of computerized voting systems were within the bounds of legitimate debate over a matter of grave public concern. 28 U.S.C. §2254(d)(2).

II. **The Decision of the Colorado Courts to Keep Ms. Peters Incarcerated During Her Appeal Was Arbitrary in Violation of the Fourteenth Amendment.**

**A.** A foundational violation of due process tainted the trial court's decision on Ms. Peters' Motion for Bond Pending Appeal because the sole motivation for Ms. Peters' actions – nothing more sinister than complying with federal law – never informed the trial court's consideration of the fundamental bail questions of whether Ms. Peters was a danger to the community or a flight risk, much less the additional factors to be examined, such as the nature of the offense and the defendant's mental condition.

The trial court refused to consider the federal election-records preservation statutes, Ms. Peters' understanding of the legal duty these statutes imposed on her, or to her rationale for her actions in concluding that she presented a danger to the community. This arbitrary exclusion of what were undeniably material factors in reaching a decision on whether she should be released on bond pending her appeal deprived Ms. Peters of fundamental fairness in the trial court's decision-making on her Motion.

A judicial proceeding in which the court deliberately restricts the factors and evidence to be considered in favor of one of the parties and ignores statutory obligations that were imposed on one of the parties deprives that party of the fundamental fairness that is the hallmark of due process. *See Morrissey v. Brewer,* 408 U.S. 471, 489 (1972) (Due process requires a "neutral and detached" factfinder.). The trial court's refusal to acknowledge the existence of the duty established by 52 U.S.C. §§20701 and 21802(a) that is imposed on all election officials, such as Ms. Peters, while concluding that she was "a charlatan" who "betrayed your oath for no one other than you," App 98:9-10; 99:18-19, displayed a bias that tainted the entire proceeding.

**B.** The violation of Ms. Peters' due process rights was manifested in another way by the trial court in allowing the prosecution to introduce evidence that there had been a "security

18

breach" as a result of the online publication in August 2021 of partially redacted BIOS passwords to the Mesa County computerized voting system. (These passwords are a security feature that protects a computer's Basic Input/Output System.) Ms. Peters did not publish the information online, and she did not authorize anyone else to publish it.; moreover, the prosecution was aware that the publication of the partial passwords was not a security breach.

For several months ending on October 24, 2024, passwords enabling access to computerized voting systems in 34 of Colorado's 64 counties were posted publicly and improperly on the website of the Colorado Department of State in a hidden tab on a spreadsheet. After the online posting of the passwords was discovered, Governor Jared Polis and Secretary Griswold issued a joint statement on November 1, 2024, that included the following:

> Colorado elections include many layers of security. The passwords that were improperly disclosed were one of two passwords needed in combination to make changes to a voting system and can only be used with in-person physical access.

App 580.  In an October 29, news release, Secretary Griswold stated:

> There are two unique passwords for every election equipment component, which are kept in separate places and held by different parties.

App 582. On October 31, 2024, Deputy Secretary of State Christopher Beall wrote to Colorado Republican Party legal counsel and officials stating that

> because Colorado's voting systems are protected by layers of security and redundancies, no single error can compromise the integrity of the system.

App 583-584.

Although the prosecutors in Ms. Peters' case were aware of these security protections, they repeatedly told the jury that the single partial password copied on Peters' cell phone and posted online in early August 2021 without her knowledge or involvement constituted a security breach. App 633:15 – 634:1; 638:1-2; 639:8-9;

640:24-25; 641:3-14; 642:7-14; 642:25 – 643:6; 644:10-15; 647:6-15; 650:13-20; 653:9-23; 654:10:18; 656:4-7.  The prosecutor misled the jury about the law and the facts in its rebuttal closing, leaving Ms. Peters' counsel without an opportunity to respond.  In its post-trial brief, the prosecutor referred to this due process violation as "harmless" and "fleeting" error. App 619 ¶9.  By the Secretary's description of the "many layers of security" for the protection of passwords, a breach could not have been caused by that online posting. Ms. Peters' act of photographing the laptop computer screen of an employee of the Secretary and capturing an image of the partial password did not violate any then-existing statute or rule.

The prosecution's insistence to the jury that the photographing and publishing of a partially redacted password was an improper or illegal security breach, -–a flagrant untruth---had the effect of prejudicing the jury and constitutes grounds for invalidating the verdict. The trial court's embrace of this lie, allowing it to taint the jury's deliberations, unavoidably also tainted the trial court's adjudication of Ms. Peters' Motion for Bond Pending Appeal.

**C.** Finally, a juror in Ms. Peters' trial was interviewed after the trial by a private investigator retained by Ms. Peters' legal team. App 585-587.  The juror discovered that the telephone line at her place of business had been cut on the first Friday after the trial commenced. That interruption cost her $4,000. The incident made her think that she was being targeted by supporters of Ms. Peters. App 588-589.  The juror never revealed her fear of Ms. Peters to the Court or counsel before she voted to convict Ms. Peters.

"It is well settled that a defendant in a criminal trial enjoys the right to an impartial jury." *United States v. Visinaiz*, 428 F.3d 1300, 1312 (10th Cir. 2005). *See also Morgan v. Illinois*, 504

U.S. 719, 727 ("[D]ue process alone has long demanded that … the jury must stand impartial and indifferent."); *Patton v. Yount,* 487 U.S. 1025 (examination of the impartiality of an individual juror in habeas corpus proceedings). Accordingly, trial counsel for Ms. Peters requested that the district court conduct a hearing to determine whether Ms. Peters' right to an impartial jury had been violated. App 590. The district court undeniably abused its discretion in denying that request. App 593.

**III. THE DECISION OF THE COLORADO COURTS TO KEEP MS. PETERS INCARCERATED DURING HER APPEAL DENIES MS. PETERS THE IMMUNITY FROM STATE PROSECUTION TO WHICH SHE IS ENTITLED UNDER THE SUPREMACY CLAUSE AND THE PRIVILEGES OR IMMUNITIES CLAUSE.**

**A.** As County Clerk and Recorder of Mesa County, and the "chief election official for the county," C.R.S. §1-1-110(3), Ms. Peters' duties were largely dictated by federal law, by the command of a federal statute, 52 U.S.C. §21081(a)(voting systems used in the election of federal officers must meet federal requirements). *See also* Federal Election Comm'n, VOTING SYSTEMS STANDARDS, VOLUME I – PERFORMANCE STANDARDS (2002)("VSS").

Both the U.S. Code and the VSS create legal regimes designed to preserve all records needed to perform the audit of elections so critical in ensuring public confidence in those elections:

> Election audit trails provide the supporting documentation for verifying the correctness of reported election results. They present a concrete, indestructible archival record of all system activity related to the vote tally, and are essential for public confidence in the accuracy of the tally, for recounts, and for evidence in the event of criminal or civil litigation.

V.S.S. 2.2.5.1.

Accordingly, "[a]ll records and papers … relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" must be preserved for 22

months by every election officer. 52 U.S.C. § 20701. "To ensure system integrity, all systems shall … (m)aintain a permanent record of all original audit data that cannot be overridden but may be augmented by designated officials in order to adjust for errors or omissions." V.S.S. 2.2.4.1(h). "System" is a comprehensive concept, including "the software required to program, control, and support the equipment that is used to define ballots, to cast and count votes, to report and/or display election results, and to maintain and produce all audit trail information." V.S.S. 1.5.1.

The U.S. Department of Justice has underscored the importance of the federal records-retention statute, which was originally enacted in the Civil Rights Act of 1960:

> The Act protects the right to vote by ensuring that federal elections records remain available in a form that allows for the Department to investigate and prosecute both civil and criminal elections matters under federal law…. [T]he detection, investigation, and proof of election crimes – and in many instances Voting Rights Act violations – often depend[s] on documentation generated during the voter registration, voting, tabulation, and election certification processes.

U.S. Department of Justice, *Federal Law Constraints on Post-Election "Audits,"* at 2 (April 2024), *available at* https://www.justice.gov/crt/media/1348586/dl.  Importantly, the "materials covered by [the statute] extend beyond 'papers' to include other 'records.' Jurisdictions must therefore also retain and preserve records created in digital or electronic form." *Id.* The Department has explained that the statute "protects the right to vote by ensuring that federal elections records remain available in a form that allows the Department to investigate and prosecute both civil and criminal elections matters under federal law." *Id.*

The Department has likewise emphasized the significance of the duty imposed on elections officials like Ms. Peters to preserve election records: "The Department interprets the Civil Rights Act to require that covered election records be retained either physically by election officials themselves, or under their direct administrative supervision…. This is because the

document retention requirements of this federal law place the retention and safekeeping duties squarely on the shoulders of election officers." *Id.*, at 2-3 (internal quotations omitted). Finally, the Department cautions that "[t]here are federal criminal penalties attached to willful failures to comply with the retention and preservation requirements of the Civil Rights Act." *Id.,* at 3.

    **B.** The Supremacy Clause of the United States Constitution entitles an individual to a right not to be tried in a state court for actions taken to comply with a duty imposed by federal law. *Cunningham v. Neagle,* 135 U.S. 1, 75 (1890) (An individual acting pursuant to federal law "cannot be guilty of a crime under…[state] law."); *Livingston,* 443 F.3d at 1217. Ms. Peters moved to dismiss the indictment, asserting her immunity under the Supremacy Clause and the Privileges or Immunities Clause of the Fourteenth Amendment App 595. The district court denied her motion based on the erroneous conclusion that Ms. Peters was not a federal officer and was not acting at the behest of federal authorities. Alternatively, the district court erroneously concluded that the indictment did not charge her with crimes related to her federal duty to preserve election records or to actions that were necessary to such compliance. In addition, the district court concluded that Ms. Peters could have complied with the federal duty without engaging in the deceptive actions charged in the indictment. App 616. Not only did the trial court have no authority to decide whether federal immunity applied to Ms. Peters' actions, the court unmistakably erred as a substantive matter in concluding the Ms. Peters was not entitled to Supremacy Clause immunity, going so far as to ignore the governing federal precedents.

    The determination of whether Ms. Peters was entitled to Supremacy Clause immunity is not left to a state court. *Arizona v. Manypenny,* 451 U.S. 232, 241 (1981) (construing the removal statute); *Tennessee v. Davis,* 100 U.S. 257, 263 (1879) ("if their protection must be left to the

action of the State court,---the operations of the general government may at any time be arrested by one of its members."); *Livingston,* 443 F.3d at 1222 (protection against the possibility of a hostile state forum"); *Kentucky v. Long,* 837 F.2d 727, 750-51 (6th Cir. 1988) (noting the purpose of the removal statute); *West Virginia v. Laing,* 133 F. 887, 891 (4th Cir. 1904) ("If such court has that right, then the federal government is without the power necessary for its own protection."). Supremacy Clause immunity serves "to avoid requiring a federal officer to run the gauntlet of standing trial and having to wait until later to have the [immunity] issue resolved." *New York v. Tanella,* 374 F.3d 141, 147 (2d Cir. 2004).

The Supremacy Clause prohibits actions by States that conflict with federal law. *Chapman v. Housing Welfare Rights Org.,* 441 U.S. 600, 613 (1979); *McCulloch v. Maryland,* 17 U.S. 316, 436 (1817). That provision is designed to prevent States from "imped[ing] or frustrat[ing] the legitimate execution of federal law." *Livingston,* 443 F.3d at 1217. "[T]he Supreme Court has consistently held that federal supremacy determines a state court's jurisdiction to try a federal official of a state crime…." *Whitehead v. Senkowski,* 943 F.2d 230, 233 (2d Cir. 1991).

The Privileges or Immunities Clause was similarly intended to assure compliance by the States with federal law: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. . . ." Amendment 14, §1, cl. 2. *See* Rich, *Why "Privileges or Immunities"? An Explanation of the Framers' Intent,* 41 AKRON L. REV. 1111, 1118 (2009); Aynes, *On Misreading John Bingham and the Fourteenth Amendment,* 103 YALE L. J. 57, 70-73 (1993). To achieve that end, the Privileges or Immunities Clause protects "the right of the citizen of this country … to engage in administering [the national government's] functions." *Slaughterhouse Cases,* 83 U.S. 36, 79 (1872). *See also In re Quarles,* 158 U.S. 532,

536-37 (1895) ("To leave to the several states the prosecution and punishment of conspiracies to oppress citizens of the United States, in performing the duty and exercising the right of assisting to uphold and enforce the laws of the United States, would tend to defeat the independence and the supremacy of the national government.").

As we have described above, the federal duty in Ms. Peters' case was expressly imposed by federal statutes, leaving her with "no liberty to refuse to perform." *Cunningham v. Neagle,* 135 U.S. at 69.

It is not necessary for purposes of Supremacy Clause immunity that the actions for which an individual is charged under state law be specifically authorized by federal law. *Livingston,* 443 F.3d at 1227-28; *Clifton v. Cox,* 549 F.2d 722, 768 (9th Cir. 1977); *see Sowders v. Damron,* 457 F.2d 1182, 1183 (10th Cir. 1972). The actions that are entitled to be immunized include those that are within the scope of the individual's authority when done in good faith. *Colorado v. Nord,* 377 F.Supp.2d 945, 950 (D. Colo. 2005). Immunity covers acts which she is authorized to do if she had "an objectively reasonable and well-founded basis to believe that [her] actions were necessary to fulfill [her] duties." *Livingston,* 443 F.3d at 1222. In *Cunningham v. Neagle,* a deputy marshal assigned to protect a Supreme Court Justice was entitled to federal immunity against a state charge of murder for killing a man whom the deputy marshal mistakenly thought was drawing a knife to attack the Justice. 135 U.S. at 75. A federal marshal was immunized against a state murder charge in *Clifton v. Cox,* even though he made a mistake in judgment and exceeded his express authority. In *Baucom v. Martin,* 677 F.2d 1346 (11th Cir. 1982) a federal agent was granted Supremacy Clause immunity to prevent his state prosecution for a state crime of attempted bribery when he was participating in undercover law enforcement activities without express authorization to violate state criminal law. *Id.,* at 1348-49.

Supremacy Clause immunity is not limited to federal officers and employees but extends to any individual who acts pursuant to a duty imposed by federal law. *Hunter v. Wood,* 209 U.S. 205, 210 (1908); *Brown v. Nationsbank Corp.,* 188 F.3d 579, 589 (5th Cir. 1999); *Connecticut v. Marra,* 528 F.Supp. 381, 385 (D.Conn. 1981); *Ex parte Conway,* 48 F. 77 (C.C.D.S.C. 1891). The determining factor is not the employment status of the individual but rather the existence of a federal duty. *See Mesa v. California,* 489 U.S. 121, 127 (1989). Ms. Peters's duty to execute federal law was unambiguously imposed by the clear texts of federal statutes.

## CONCLUSION

For the foregoing reasons, the Court should grant the writ of habeas corpus and order the immediate release of Ms. Peters, continuing the $25,000 surety bond that she posted in the trial court. Ms. Peters further requests that the bond conditions include permission for Ms. Peters to remain in her home in Grand Junction; attend all medical appointments, including follow-up for cancer and fibromyalgia; continue her employment; travel outside the State for business purposes; and visit her 95-year-old mother in Virginia.

Respectfully submitted,

/s/ *Patrick M. McSweeney*

John Case
John Case, P.C.
6901 South Pierce St. #340
Littleton, CO 80128
(303) 667-7407
brief@johncaselaw.

Patrick M. McSweeney
Robert J. Cynkar
McSweeney, Cynkar & Kachouroff, PLLC
3358 John Tree Hill Road
Powhatan, VA 23139
(804) 937-0895
patrick@mck-lawyers.com

*Counsel for Applicant Tina Peters*